HAROLD STOHLTS ET AL. *v.* JAMES F. GILKINSON ET AL.
(AC 24618)

Lavery, C. J., and Schaller and Dupont, Js.

Argued September 22, 2004—officially released March 1, 2005

*Scott W. Jezek* and *Averum J. Sprecher*, for the appellants (defendants).

*Owen P. Eagan*, for the appellees (plaintiffs).

### Opinion

LAVERY, C. J. The defendants, James F. Gilkinson, individually and as trustee of the Gilkinson Family Trust, and Robert Dickinson, appeal from the judgment of the trial court, rendered after a trial to the court, in favor of the plaintiffs, Harold Stohlts and Robin Stohlts. On appeal, the defendants claim that the court improperly (1) found title of a certain parcel of land in favor

of the plaintiffs, (2) found that the general public has a right to use Old Turnpike Road, (3) found the defendants liable for intentional infliction of emotional distress and awarded damages for that tort, including punitive damages and (4) placed restrictions on the use of the defendants' property and of Old Turnpike Road by granting relief to the plaintiffs. We affirm the judgment of the trial court.

This case arises out of a dispute between two abutting property owners. The plaintiffs asserted the following claims at trial: Trespass, obstruction of right-of-way, action to settle title of land and negligent infliction of emotional distress.[1] The court found for the plaintiffs on the claims of obstruction of right-of-way, action to settle title of land and negligent infliction of emotional distress. It awarded compensatory and punitive damages and injunctive relief, and quieted title in favor of the plaintiffs.

The court found the following facts. In 1999, the plaintiffs purchased real property in Haddam from Ian Edwards and Lisa Edwards. This property consisted of approximately seven acres of land and was abutted by the property of Gilkinson and the Gilkinson Family Trust, which owned roughly 500 acres in the surrounding area. Because Gilkinson lived in California, his cousin, Dickinson, was the caretaker for the property.

Dickinson and the plaintiffs coexisted peaceably until roughly three months after the plaintiffs purchased their property. At that time, Dickinson and Gilkinson's attorney, Sebastian Giuliano, began to harass and intimidate the plaintiffs at Gilkinson's behest in an attempt to drive the plaintiffs from their property. Instances of harassment included but were not limited to claiming ownership of a shared road that accessed both parties'

---

[1] The plaintiffs also asserted a claim for enforcement of a settlement agreement, but it was withdrawn orally during the trial.

properties and attempting to make the plaintiffs purchase a right-of-way to access their property, claiming ownership of land that belonged to the plaintiffs, filing a false survey on the land records, placing boulders blocking the plaintiffs' driveway to deny them access to their property, creating ruts in the road to make access to the driveway difficult and using a backhoe to dig a very large trench near the property line to install an unsightly, partially constructed fence made of polyvinyl chloride (PVC) pipes. Correspondence between the individuals in this case and other evidence indicated that Gilkinson himself filed the false survey and orchestrated or instructed Dickinson and Giuliano to continue the other incidents of harassment.

The plaintiffs attempted to reason with the defendants by talking to Dickinson and sending letters to Gilkinson. When these measures failed, the plaintiffs filed this action. The defendants now appeal from the judgment of the trial court. Further facts will be provided as necessary.

I

In their first claim, the defendants contend that the court improperly found that the plaintiffs possessed record title to certain property. The court found the following additional facts. "In July, 1999, the plaintiffs . . . purchased real property known as 79 Park Road (formerly known as 160 Old Turnpike Road), Haddam, Connecticut, from Ian [Edwards] and Lisa Edwards. Their deed included two descriptions, one known as the historic description found in schedule A of the deed and the second known as the metes and bounds description found in schedule A-1 of the deed. . . .

"Old Turnpike Road was a proprietor's road created back in the 1600s. The road included a switchback near its intersection with Mill Creek in Haddam, Connecticut. The switchback was clearly identified on the Ziobron

survey map, the Meehan survey map, and all other maps in evidence going back as far as 1802. Old Turnpike Road was the landmark that separated the Stohlts property from the Gilkinson property to the south and had been the landmark referred to in the deeds found in both the Stohlts and the Gilkinson chain of title for at least 159 years. The difference between the so-called historic description of the property and that contained in the metes and bounds description . . . is a triangular piece of land approximately one half an acre in size." The court ultimately rendered judgment quieting and settling title in the plaintiffs and concluded that there was clear error in the metes and bounds description that should be ignored in light of the correct historical description.

The defendants argue that the court incorrectly based its finding on the less precise historical deed description and the 2002 Meehan survey rather than the legal description divined from the Ziobron survey. Citing *Mt. Maumee Partnership* v. *Peet*, 40 Conn. App. 752, 755, 673 A.2d 127, cert. denied, 237 Conn. 924, 677 A.2d 947 (1996), and *Barri* v. *Schwarz Bros. Co.*, 93 Conn. 501, 510, 107 A. 3 (1919), the defendants maintain that our law provides that when a deed contains multiple descriptions of the same parcel that appear to be either inconsistent or irreconcilable, "the rule is that the description containing less certainty must yield to that with greater certainty." We agree with the court that reliance on these cases is misplaced in this case where one description is clearly erroneous. This case is more analogous to other cases in which the pivotal questions concerned the parties' chains of title and whether various conveyances established the location of a boundary line between the two properties. See *Feuer* v. *Henderson*, 181 Conn. 454, 459–60, 435 A.2d 1011 (1980); see also *Wheeler* v. *Foster*, 44 Conn. App. 331, 334, 689 A.2d 523 (1997).

"[W]here the testimony of witnesses as to the location of the land described in deeds is in conflict, it becomes a question of fact for the determination of the court which may rely on the opinions of experts to resolve the problem and it is the court's duty to accept that testimony or evidence which appears more credible. . . . Thus, we conclude that the appropriate scope of review is whether the trial court's findings were clearly erroneous.

"[W]e will upset a factual determination of the trial court only if it is clearly erroneous. The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Wheeler* v. *Foster*, supra, 44 Conn. App. 334.

As found by the court, the historic description, including the switchback, has been in the plaintiffs' chain of title for 159 years, including the current deed. The two most recent deeds also have included a metes and bounds description founded in the survey done by Richard Ziobron. This survey is clearly at odds with the historic description, but there was no explanation therein for the change in the boundary, and experts testified at trial that Ziobron ignored mapping and surveying standards and failed to honor the calls in the deeds. In addition, the deeds containing the incorrect boundary included limiting language warranting title to the property in accordance with the historic descrip-

tion, but not the accuracy of the legal description.[2] The court found that it was clear that the triangular piece of land always had been included with the transfer of the plaintiffs' property and that prior owners never maintained any interest in the land when they granted it to others.

The defendants argue that the plaintiffs must rely on the strength of their own title and not of the weakness of their adversaries' claim. See *Koennicke* v. *Maiorano*, 43 Conn. App. 1, 9, 682 A.2d 1046 (1996). Although this is true, the plaintiffs have proven that they possess title to the switchback. Even if it was determined that the plaintiffs did not possess title, the court would be barred from settling title to the property in the defendants without proof that they had some rightful claim to the land. In this case, the defendants offered no evidence that they had ever possessed title to the parcel of land. Therefore, we cannot conclude that the court improperly quieted and settled title to the switchback in the plaintiffs. It would be an unreasonable result to quiet title in the defendants when they presented no evidence that they ever owned the parcel of land and when it is obvious that the past grantors intended to convey all of their property interest to the plaintiffs.

## II

In their second claim, the defendants maintain that the court improperly found that the general public has a right to use Old Turnpike Road. They argue that the court could not make a finding regarding the public's right because the plaintiffs never claimed any public

[2] The description in the deed to the Edwardses was followed by the language: "The Grantors warrant the legal title to the herein described premises, but do not warrant the precise boundaries of the same." The Edwards' deed to the plaintiffs contained the language: "Being the same premises conveyed to the Grantors in the Warrantee Deed from Russell H. Shailer, Jr. and Emily S. Shailer to Ian Edwards and Lisa Edwards recorded in Volume 155, Page 74 of the Haddam land records."

right to the road in their amended complaint and no representative of the town or of the public at large was ever made a party to the action. We disagree.

In its memorandum of decision, the court stated: "The defendants argue, without presenting any evidence, that Old Turnpike Road was abandoned 100 years ago. In 1988, the town of Haddam approved the permit for the driveway on the [plaintiffs'] property pursuant to a plot plan which showed Old Turnpike Road. Clearly, that approval showed that as recently as 1988, the town considered Old Turnpike Road to be a public roadway. While the town of Haddam may not plow Old Turnpike Road, it remains a public road until it has been adjudicated abandoned. General Statutes §§ 8-24 and 13a-49. In the instant case, both the plaintiffs and . . . Gilkinson own to the center of Old Turnpike Road subject to the rights of the public and each other to use the road."

At trial, the defendants claimed that Old Turnpike Road was their driveway and that it had been abandoned over 100 years earlier. We agree with the plaintiffs that the defendants, in pursuing this argument, put the status and ownership of the road at issue such that the court's finding was proper.

"To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . When, however, the trial court draws conclusions of law, our review is plenary and we must

decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. Practice Book [§ 60-5] . . . ." (Citations omitted; internal quotation marks omitted.) *Mackie* v. *Hull*, 69 Conn. App. 538, 545–46, 795 A.2d 1280, cert. denied, 261 Conn. 916, 917, 806 A.2d 1055 (2002).

"A highway may be extinguished [1] by direct action through governmental agencies, in which case it is said to be discontinued; or [2] by nonuser by the public for a long period of time with the intention to abandon, in which case it is said to be abandoned."[3] (Internal quotation marks omitted.) Id., 547. "The methods of discontinuing a highway through governmental agencies are prescribed by law and must be strictly followed. . . . General Statutes § 13a-49 empowers town selectmen to discontinue highways unless the highway was laid out by a court or the General Assembly. General Statutes § 13a-50 provides that the Superior Court may discontinue any highway that cannot be discontinued by the selectmen."[4] *Marrin* v. *Spearow*, 35 Conn. App. 398, 404, 646 A.2d 254 (1994).

---

[3] In *Mackie*, we explained that " '[n]onuser' is a term of art utilized in early Connecticut case law. . . . In this opinion, we use the term 'nonuse' interchangeably with this early term of art." *Mackie* v. *Hull*, supra, 69 Conn. App. 547 n.2. Additionally, we noted that "[o]ur common law does not fix by 'bright line' the number of years of nonuse with the intent to abandon necessary to find that nonstatutory 'abandonment' of the public right to travel over a highway has taken place." Id., 547 n.3.

[4] General Statutes § 13a-49 provides in relevant part: "The selectmen of any town may, subject to approval by a majority vote at any regular or special town meeting, by a writing signed by them, discontinue any highway or private way, or land dedicated as such, in its entirety, or may discontinue any portion thereof or any property right of the town or public therein, except when laid out by a court or the General Assembly, and except where such highway is within a city, or within a borough having control of highways within its limits. . . ."

General Statutes § 13a-50 provides in relevant part: "The Superior Court, on the application of any person, may discontinue any highway in the judicial district where it is held, which cannot be discontinued by the selectmen . . . ."

As found by the court, no evidence was presented showing that there had been an official discontinuation of the highway by the town. Therefore, we must determine whether the public has abandoned the road through a failure to use it for an extended period of time. The court found that, as recently as 1988, the town considered Old Turnpike Road to be a public highway because it approved the permit for the driveway on the plaintiffs' property pursuant to a plot plan. Although the length of time during which nonuse on the part of the public must continue before the highway is presumed to be abandoned has not been determined, it must be substantial. See *Appeal of Phillips*, 113 Conn. 40, 45–46, 154 A. 238 (1931). In light of the court's finding that there was no evidence of intent to abandon for a sufficient period of time, we conclude that the intent to abandon the road for the required time period has not been established. Therefore, the road was neither abandoned nor discontinued, and the court properly concluded that Old Turnpike Road is still a public highway. No interest in fee may be had in a public highway. Rather, the landowners whose lands abut it continue to be the owners of the soil to the middle of the highway, subject to the rights of the public and each other to use the road. See *Luf* v. *Southbury*, 188 Conn. 336, 341, 449 A.2d 1001 (1982); *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, 142 Conn. 349, 355, 114 A.2d 216 (1955). The court did not create a new right in the public with its ruling, but merely expressed the correct law as pertains to the contested ownership of the highway.

### III

The defendants next claim that the court improperly found them liable for intentional infliction of emotional distress and awarded damages for that tort, including punitive damages. We disagree.

## A

We first address the defendants' argument that the plaintiffs failed to plead intentional infliction of emotional distress and to request punitive damages. The defendants mischaracterize the court's ruling as to the emotional distress claim. The court never made a finding of intentional infliction of emotional distress. Instead, the court made a finding of negligent infliction of emotional distress, as properly pleaded by the plaintiffs. The defendants maintain that the court, in fact, was ruling on a claim of intentional infliction of emotional distress because of its subsidiary finding that the defendants' conduct was intentional and was meant to harass the plaintiffs. We disagree.

To establish a claim of negligent infliction of emotional distress, a plaintiff must prove the following elements: "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 444, 815 A.2d 119 (2003). We can find no legal authority supporting the proposition that the requisite conduct cannot be intentional. As set forth previously, the elements of negligent infliction of emotional distress do not require proof of any particular level of intent. In fact, intent need not be proven at all to establish a claim of negligent infliction of emotional distress. If, however, a plaintiff can prove that the underlying conduct was intentional, the plaintiff has met his or her burden of establishing that punitive damages, in addition to compensatory damages, should be awarded. Therefore, the defendants' argument that the court improperly granted relief on the basis of an unpleaded claim of intentional infliction of emotional distress is without merit.

In conjunction with the plaintiffs' claim of negligent infliction of emotional distress, the court awarded both compensatory and punitive damages. The punitive damages, consisting of attorney's fees, were awarded by the court on the basis of its finding that the defendants "acted wantonly and maliciously with reckless in difference to [the plaintiffs'] rights." The defendants argue that the court incorrectly awarded punitive damages because they had not been properly pleaded.

"Generally, attorney's fees may not be recovered, either as costs or damages, absent contractual or statutory authorization. . . . Attorney's fees may be awarded, however, as a component of punitive damages. . . . To furnish a basis for recovery of such damages, the pleadings must allege and the evidence must show wanton or wilful malicious misconduct, and the language contained in the pleadings must be sufficiently explicit to inform the court and opposing counsel that such damages are being sought." (Citations omitted; internal quotation marks omitted.) *Farrell* v. *Farrell*, 36 Conn. App. 305, 311, 650 A.2d 608 (1994). As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the complaint is insufficient to allow recovery. *Tedesco* v. *Stamford*, 215 Conn. 450, 459, 576 A.2d 1273 (1990), on remand, 24 Conn. App. 377, 588 A.2d 656 (1991), rev'd, 222 Conn. 233, 610 A.2d 574 (1992).

As the court noted, the plaintiffs sought punitive damages in their amended complaint, although they had not specifically requested them in their claims for relief. Because legal fees can be recovered only through the awarding of punitive damages or when authorized by statute or contract, the defendants necessarily were on notice that legal fees were being claimed in the event that the plaintiffs were successful in their claim for punitive damages. The claim for punitive damages also

was made explicitly in the plaintiffs' posttrial brief. The defendants were given an adequate opportunity to argue against such damages in their response brief, which they did.

Additionally, the plaintiffs' amended complaint painted a clear picture of an abutting landowner going to extreme measures to harass his neighbor. The incidents recounted included but were not limited to blocking their driveway, filing a false survey on the land records, building an unsightly fence and digging with machinery from six in the morning until ten thirty at night. Although the claim alleged was negligent infliction of emotional distress, the underlying conduct was intentional harassment.[5] The defendants necessarily were on notice that punitive damages were being claimed because of the type of conduct pleaded and the fact that attorney's fees, in this case, could be obtained only through the awarding of punitive damages. The claim for punitive damages also was made explicitly in the plaintiffs' posttrial brief. The defendants were given an adequate opportunity to argue against such damages in their response brief, which they did. Thus, we must conclude that the plaintiffs' pleadings were sufficiently explicit to inform the defendants that the plaintiffs were seeking punitive damages so as not to surprise or prejudice the defendants.

## B

The defendants also maintain that their conduct was insufficient to support the court's finding that they had inflicted emotional distress on the plaintiffs and were liable for punitive damages. We disagree.

---

[5] Our research revealed no cases from other jurisdictions that prohibit punitive damages as a matter of law in claims for negligent infliction of emotional distress. See *Stump* v. *Ashland, Inc.*, 201 W. Va. 541, 553 n.9, 449 S.E.2d 41 (1997).

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court." (Internal quotation marks omitted.) *State* v. *Henderson*, 83 Conn. App. 739, 745, 853 A.2d 115, cert. denied, 271 Conn. 913, 859 A.2d 572 (2004).

Additionally, our Supreme Court has consistently stated that "[i]n order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . If the evidence discloses that a defendant was recklessly indifferent to the rights of a plaintiff, an actual intention to do harm to the plaintiff is not necessary." (Citations omitted; internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 811, 614 A.2d 414 (1992).

"A wilful or malicious injury is one caused by design. Wilfulness and malice alike import intent. . . . [Its] characteristic element is the design to injure either actually entertained or to be implied from the conduct and circumstances. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the rights or safety of others or of the consequences of action." (Citations omitted; internal quotation marks omitted.) *Markey* v. *Santangelo*, 195 Conn. 76, 78, 485 A.2d 1305 (1985). Punitive damages do not need to be alleged explicitly in the complaint or included in the claims for relief as long as the pleadings give the defendant sufficient notice that he is being charged with aggravated conduct rather than mere negligence. Id., 78–79.

The defendants take issue with the court's reliance on the following evidence in finding that they inflicted

emotional distress on the plaintiffs: (1) the utility pole and power line dispute; (2) the sound from the backhoe used to dig a trench on the defendants' property and the subsequent installation of PVC pipes in that trench; and (3) the obstruction of the entrance to the plaintiffs' driveway. We address each in turn.

1

The defendants first argue that the court improperly used evidence of a utility pole and power line dispute in rendering its decision regarding the infliction of emotional distress. They maintain that the court allowed this evidence to be presented only for the limited purpose of establishing agency between Dickinson and Gilkinson and then proceeded to use it for a totally different purpose. We agree.

When setting out its decision regarding emotional distress the court stated: "The defendants threatened to cut down the utility pole which serviced the [plaintiffs'] property with electricity. The utility pole had existed in the same spot prior to 1986 when the [plaintiffs'] home was built. The pole was located on public property, i.e., the shoulder of Park Road. The utility pole serviced the [plaintiffs'] home starting in 1986 and two houses owned by . . . Gilkinson for many years prior to 1986. The threat to remove the pole came after several letters were written and sent by . . . Gilkinson through his attorney, Sebastian Giuliano, to [Connecticut Light and Power Company] and to the [plaintiffs]. The threat to remove the pole appeared to be real despite the fact that it was an irrational and outrageous threat. The [plaintiffs'] fear of losing power to their house involved an unreasonable risk of causing them emotional distress."

"The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited

to the allegations of his complaint. . . . What is in issue is determined by the pleadings and these must be in writing. . . . Once the pleadings have been filed, the evidence proffered must be relevant to the issues raised therein." (Internal quotation marks omitted.) *Dubreuil v. Witt*, 80 Conn. App. 410, 425, 835 A.2d 477 (2003), aff'd, 271 Conn. 782, 860 A.2d 698 (2004).

Although the plaintiffs did claim that they were harassed by the defendants, they did not allege in their amended complaint that there was a dispute over the electrical lines. In light of the court's own statement that this evidence was admitted to prove "agency . . . on a topic that is not in this lawsuit," we agree with the defendants' argument that the court improperly used this evidence. "Evidence . . . offered and admitted for a limited purpose only, and the facts found from such evidence, cannot be used for another and totally different purpose." *O'Hara v. Hartford Oil Heating Co.*, 106 Conn. 468, 473, 138 A. 438 (1927). The plaintiffs contend that additional evidence on this issue was presented, and thus, the court could use the issue to prove the emotional distress claim. After a review of the record, we have determined that the evidence allowed mainly was presented to prove agency between Dickinson and Gilkinson and was introduced prior to the court's decision that this was an unpleaded collateral matter. The court should have used evidence of the utility pole and power line dispute only as to the issue of agency. Therefore, the court improperly relied on this evidence to establish the plaintiffs' cause of action for negligent infliction of emotional distress and their claim for punitive damages. Nevertheless, we conclude that this error was harmless because, even without this evidence, there was sufficient evidence for the court to find for the plaintiffs on the negligent infliction of emotional distress claim and to award punitive damages.

2

The defendants also claim that the sound from Gilkinson's backhoe during the digging of a trench for a PVC pipe fence was not a proper fact to be used by the court in determining whether the defendants inflicted emotional distress on the plaintiffs. We disagree.

The defendants are correct that the court found that the plaintiffs did not prove that the digging and partial installation occurred on their land, and, thus, no action for trespass was allowed. This does not mean that these facts could not be used as a basis for the emotional distress claim. The court found that "[t]he third example of the defendants' unreasonable conduct involved the installation of the PVC pipe fence. Gilkinson instructed Dickinson to dig a deep trench and install a fence along the westerly border line of the [plaintiffs'] property. Dickinson again used Gilkinson's backhoe, rather than a conventional post hole digger, to dig an incredibly deep trench. He intentionally erected the most unsightly 'fence' imaginable. The fence was made of PVC pipes which were installed at varying heights and at all pitches and angles. The digging activity with the backhoe continued from early in the morning until late at night, even after [Robin] Stohlts requested Dickinson to stop. At the least this conduct created an unreasonable risk of causing the [plaintiffs] emotional distress. The court finds that the conduct was intentionally malicious."

The plaintiffs claimed in their complaint that the digging of the trench and the installation of the PVC pipes were attempts to harass them. "[W]e long have eschewed the notion that pleadings should be read in a hypertechnical manner. Rather, [t]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he complaint must be read in its entirety in such a way as to give effect to the pleading

with reference to the general theory upon which it proceeded, and do substantial justice between the parties.
. . . Our reading of pleadings in a manner that advances substantial justice means that a pleading must be construed reasonably, to contain all that it fairly means, but carries with it the related proposition that it must not be contorted in such a way so as to strain the bounds of rational comprehension." (Internal quotation marks omitted.) *Broadnax* v. *New Haven*, 270 Conn. 133, 173–74, 851 A.2d 1113 (2004). Evidence of the type of fence, its incomplete state and the hours at which digging occurred all were admitted at trial. We conclude that the amended complaint can be read in a reasonable manner as to include an issue regarding the noise created during the digging of the trench. The fact that the defendants engaged in these activities on their own property is of no consequence. The digging of the trench was part of a systematic plan to harass the plaintiffs. We agree with the plaintiffs that the way in which this fence was installed, the trench dug and the time at which it was done all establish a malicious intent. We cannot determine that the court improperly considered these factors.

3

The defendants also maintain that the obstruction of the plaintiffs' driveway with a large boulder should not have been considered as evidence of infliction of emotional distress because it was done at the instruction of their attorney as a means to abate a prescriptive easement sought by the plaintiffs. Additionally, they argue that even if this evidence was proper, it should not form the basis of punitive damages against Gilkinson because his employee was the perpetrator, and there is no vicarious liability for punitive damages. We disagree.

The court found that another "example of unreasonable conduct by the defendants occurred when Gilkin-

son instructed Dickinson to place boulders in front of the plaintiffs' driveway. Dickinson used Gilkinson's backhoe to place boulders in the center of the plaintiffs' driveway. This conduct would have been wilful, even if Gilkinson had had a bona fide claim to his neighbors' driveway. He did not. Moreover, based on the lack of evidence presented at trial and his 'creation' of a bogus survey, the court finds that Gilkinson knew he had no rights over the plaintiffs' driveway. Therefore, the conduct was outrageous."

The defendants contend that they blocked the driveway only at the urging of their attorney in accordance with his legal opinion. In contrast, the court found that "[t]he defendants' argument that they were just relying on the legal opinion of their attorney is simply not supported by the facts. If attorney Giuliano had indeed formed a legal conclusion that [Gilkinson] had a right to the plaintiffs' driveway, the defendants certainly would have presented evidence supporting that conclusion at trial. They did not. Mr. Gilkinson also created a bogus survey, which he filed on the land records. This [is] further evidence that he had no evidence to support any valid claims." "[I]t is without question that the [fact finder] is the ultimate arbiter of fact and credibility. . . . As such, it may believe or disbelieve all or any portion of the testimony offered. . . . It is also the absolute right and responsibility of the [fact finder] to weigh conflicting evidence . . . ." (Citation omitted; internal quotation marks omitted.) *Stuart* v. *Stuttig*, 63 Conn. App. 222, 226, 772 A.2d 778 (2001). We find no reason to disturb these facts as found by the court.

The defendants also argue that the blocking of the driveway was only temporary and did not impair the plaintiffs' rights. We find this argument disingenuous. The blocking of the driveway was halted and the boulder removed only when the police were called to the scene. In addition, a backhoe was required to move the

boulder. It does not seem likely that the driveway would have been blocked only for a part of the day. The defendants' objective and express purpose was to stop the plaintiffs from using the road and their driveway. Thus, the evidence of this blockage could be used as evidence of infliction of emotional distress and as a reason for the awarding of punitive damages.

The defendants also claim that Gilkinson should not be liable for punitive damages on the basis of this evidence because there is no vicarious liability for punitive damages. See *Matthiessen* v. *Vanech*, 266 Conn. 822, 837, 836 A.2d 394 (2003). This rule makes it improper to award punitive damages against someone who is innocent and, therefore, only liable vicariously. We do not believe this is such a situation and, thus, apply the exception stated in the Restatement (Second) of Torts. "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified . or approved the act." 4 Restatement (Second), Torts § 909 (1979); see also *Maisenbacker* v. *Society Concordia*, 71 Conn. 369, 378–80, 42 A. 67 (1899). In this case, the court found credible evidence that Gilkinson was the person controlling the harassment. It was his will that was being imposed, and it was his instructions that were being followed. Testimony by witnesses and correspondence confirmed that he was apprised of all matters and was instructing his agents on the course of action to be taken against the plaintiffs. Additionally, it was Gilkinson who filed a false survey on the land records. Gilkinson was not an innocent party in this

matter, and we will not conclude that he is not liable for punitive damages.

## IV

Last, the defendants claim that the court abused its discretion and committed plain error[6] by enjoining or placing restrictions on the time, location and manner in which the defendants are permitted to use or work upon their own property, and by limiting them to the use of only certain areas of Old Turnpike Road. We disagree and will analyze separately these two issues.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law. . . . A prayer for injunctive relief is addressed to the sound discretion of the court and the court's ruling can be reviewed only for the purpose of determining whether the decision was based on an erroneous statement of law or an abuse of discretion. . . . Therefore, unless the trial court has abused its discretion, or failed to exercise its discretion . . . the trial court's decision must stand. . . . A decision to grant or deny an injunction must be compatible with the equities in the case and balance the injury complained of with that which will result from interference by injunction." (Citation omitted; internal quotation marks omitted.) *Marquardt & Roche/Meditz & Hackett, Inc.* v. *Riverbend Executive Center, Inc.*, 74 Conn. App. 412, 421, 812 A.2d 175 (2003).

The court issued the following injunction: "The defendants . . . and their agents, servants and employees are hereby permanently enjoined and prohibited from

---

[6] "[P]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Solman*, 67 Conn. App. 235, 239, 786 A.2d 1184 (2001), cert. denied, 259 Conn. 917, 791 A.2d 568 (2002). We are not persuaded that plain error review is warranted in this case.

trespassing upon the [plaintiffs'] property as it is identified above with the exception of using their travel easement on Old Turnpike Road to gain access to their property. The defendants are permanently enjoined to absolutely cease and desist and refrain from any excavation on the [plaintiffs'] property or from placing any obstructions on the [plaintiffs'] property as to prevent them from using their property or gaining access to their property. The defendants are further enjoined from operating heavy equipment within 100 feet of the boundary line of the [plaintiffs'] property except between the hours of 7:00 a.m. and 7:00 p.m. so as to permit the quiet enjoyment of the property in that area."

A

The defendants first take issue with the court's injunction regarding the use of heavy equipment. They argue that "[t]he plaintiffs did not plead or seek injunctive relief limiting the defendants' use of their own property, and the court made no finding or conclusion that, without the issuance of such injunction, the plaintiffs would suffer irreparable harm or injury, or that the plaintiffs did not have an adequate remedy at law." We disagree.

The plaintiffs requested that the court issue an injunction. The amended complaint specifically stated that "[t]he damage caused by the defendants is real and irreparable and ongoing and requires the issuance of injunctive relief to stop the defendants from further destroying the plaintiffs' property and to prevent the defendants from further obstruction of the plaintiffs' right of passage and to prevent the defendants from further *harassing* of the plaintiffs." (Emphasis added.) Although the defendants maintain that they were not alerted by the pleadings that noise was an issue and that injunctive relief for noise abatement was being sought, we conclude, in accordance with our discussion

in part III B 2, that the defendants were not surprised or prejudiced by the inclusion of the issue of noise.

"A party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." (Internal quotation marks omitted.) *Pequonnock Yacht Club, Inc.* v. *Bridgeport*, 259 Conn. 592, 598, 790 A.2d 1178 (2002). The defendants argue that the court did not make these requisite findings before issuing the injunction. Although the court did not expressly make these findings, we conclude that they must have been found because the court made ample findings regarding the harassing and outrageous tactics of the defendants that support findings of irreparable harm and lack of an adequate remedy at law.

The defendants contend that the injunction was founded on a single incident. The court, however, set out findings based on the evidence illustrating the defendants' persistent harassment of the plaintiffs. The defendants engaged in numerous acts of harassment targeting the plaintiffs, and the court properly issued the injunction, as appropriate equitable relief. Moreover, this injunction was reasonable in that the defendants are not prohibited from ever using their property, they only are prohibited from operating heavy equipment close to the plaintiffs' property lines before 7 a.m. and after 7 p.m.

B

The defendants also take issue with the court's injunction regarding their use of the travel portion of Old Turnpike Road. We disagree.

The court found that the highway in question is a public road and, therefore, "the plaintiffs and . . . Gilkinson own to the center of Old Turnpike Road subject to the rights of each other to use the road." In its injunc-

tion, the court enjoined the defendants from trespassing on the plaintiffs' property except to use their travel easement on Old Turnpike Road to gain access to their property. The defendants believe that their rights have been violated because the court also held that the "plaintiffs have and shall have the right to pass and repass, and otherwise use for all purposes for which a public highway is used, any and all portion of the road known as Old Turnpike Road . . . as is shown on the survey map . . . ." We conclude that this is a distinction without a difference. The court may have expressed the parties' rights differently, but in essence it held that both parties own to the center of the road, subject to the right of each other and the public to use it as a public highway. See *Antenucci* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 142 Conn. 355; *Luf* v. *Southbury*, supra, 188 Conn. 341. The defendants maintain that this will be interpreted to mean that they cannot maintain and repair the road. Issues arising in the future out of whether the town, the plaintiffs, the defendants or all three, in whole or in part, are responsible for the repair and maintenance of a public road need not be decided. The court made no rulings as to such issues, nor do we.

The judgment is affirmed.

In this opinion the other judges concurred.