# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3335

_____

| | | |
|---|---|---|
| Craig Outdoor Advertising, Inc.; Curtis Massood; Midwest Outdoor Media, LLC; Patriot Outdoor, LLC, | * | |
| | * | |
| Plaintiffs - Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Viacom Outdoor, Inc.; | * | |
| | * | Appeals from the United States |
| Defendant, | * | District Court for the |
| | * | Western District of Missouri. |
| Wally Kelly; | * | |
| | * | |
| Defendant - Appellant, | * | |
| | * | |
| Randall F. Romig; Randy Jackson; Harold Gustin; CPA Carlton Beckstrom, | * | |
| | * | |
| Defendants. | * | |

_____

No. 06-3337

_____

| | | |
|---|---|---|
| Craig Outdoor Advertising, Inc.; Curtis Massood; Midwest Outdoor Media, LLC; Patriot Outdoor, LLC, | * | |
| | * | |
| Plaintiffs - Appellees, | * | |

v.                          *
                             *

Viacom Outdoor, Inc.,          *
                             *

         Defendant - Appellant,    *
                             *

Wally Kelly; Randall F. Romig;    *
Randy Jackson; Harold Gustin;    *
CPA Carlton Beckstrom,        *
                             *

         Defendants.             *

_____

No. 06-3339

_____

Craig Outdoor Advertising, Inc.;    *
Curtis Massood; Midwest Outdoor    *
Media, LLC; Patriot Outdoor, LLC,    *
                             *

         Plaintiffs - Appellees,     *
                             *

         v.                     *
                             *

Viacom Outdoor, Inc.; Wally Kelly;    *
Randall F. Romig; Randy Jackson,    *
                             *

         Defendants,             *
                             *

Harold Gustin,              *
                             *

         Defendant - Appellant,    *
                             *

CPA Carlton Beckstrom,        *
                             *

         Defendant.              *

_____

No. 06-3341

_____

| | |
|---|---|
| Craig Outdoor Advertising, Inc.; | * |
| Curtis Massood; Midwest Outdoor | * |
| Media, LLC; Patriot Outdoor, LLC, | * |
| | * |
| Plaintiffs - Appellants, | * |
| | * |
| v. | * |
| | * |
| Viacom Outdoor, Inc.; Wally Kelly, | * |
| | * |
| Defendants - Appellees, | * |
| | * |
| Randall F. Romig; Randy Jackson, | * |
| | * |
| Defendants, | * |
| | * |
| Harold Gustin, | * |
| | * |
| Defendant - Appellee, | * |
| | * |
| CPA Carlton Beckstrom, | * |
| | * |
| Defendant. | * |

_____

Submitted: October 15, 2007
Filed: June 4, 2008

_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.

_____

-3-

BOWMAN, Circuit Judge.

Craig Outdoor Advertising, Inc., Midwest Outdoor Media, LLC, Patriot Outdoor, LLC (collectively "Plaintiffs"), and Curtis Massood, the former owner of a small billboard company, filed this lawsuit in which they alleged that Viacom Outdoor ("Viacom"), and Viacom executives Wally Kelly and Harold Gustin (collectively "individual Defendants")[1] perpetrated a scheme by which Viacom and its employees and consultants would represent to businesses and individuals interested in constructing billboards on railroad property that Viacom was acting as the agent for those railroads with respect to billboard construction and that applications to build on railroad property would be evaluated on a first-come, first-served basis. In reality, however, Viacom employees or consultants reviewed each site application to determine if Viacom wanted to develop the site itself. Plaintiffs and Massood alleged that Viacom misrepresented and omitted information about the review process in an effort to induce them to identify billboard sites. Viacom then appropriated certain sites and covered up the scheme, for example, by falsely stating that another entity had applied for the site first or by failing to forward the site application to the railroad. Plaintiffs and Massood asserted claims for relief based on both Missouri and Connecticut state law and the civil remedies provisions of the Organized Crime Control Act of 1970, Racketeer Influenced and Corrupt Organizations, ("RICO"). 18 U.S.C. §§ 1961–68. Prior to trial, the District Court granted Viacom summary judgment on the RICO claims asserted by Plaintiffs against the company and dismissed all of Massood's claims. A jury returned verdicts in favor of Plaintiffs on their state-law claims and on their RICO claims against Kelly and Gustin. Viacom, Kelly, and Gustin appeal and Plaintiffs and Massood cross-appeal. The parties raise numerous claims, each of which we will address in turn.

---

[1]The jury rejected Plaintiffs' RICO claims against defendants Randall Romig and Randy Jackson, and Plaintiffs do not appeal from that verdict.

## I. VIACOM

*A. Fraud Claims.* Viacom first argues that the evidence was insufficient to support the jury's verdict in favor of Plaintiffs on their state-law fraud claims. A jury verdict is entitled to extreme deference, Morse v. S. Union Co., 174 F.3d 917, 922 (8th Cir.), cert. dismissed, 527 U.S. 1059 (1999), and we will not set it aside unless no reasonable jury could have reached the same verdict based on the evidence submitted, Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir.), cert. denied, 521 U.S. 1119 (1997). In conducting our review, we consider the evidence in the light most favorable to the jury verdict. Id. Specifically, we "assume all conflicts in the evidence were resolved in [Plaintiffs'] favor, assume [Plaintiffs] proved all facts that [their] evidence tended to prove, and give [Plaintiffs] the benefit of all favorable inferences that reasonably may be drawn from the proven facts." Morse, 174 F.3d at 922. Keeping in mind our extremely deferential standard of review, we conclude that the jury's verdict on Plaintiffs' fraud claims was supported by the evidence.

Plaintiffs asserted fraudulent-misrepresentation claims under Missouri and Connecticut law,[2] pursuant to which they were required to establish the following elements: a false material representation by Viacom; Viacom's knowledge of the representation's falsity or ignorance of its truth; Viacom's intent that Plaintiffs act on the representation "in a manner reasonably contemplated"; Plaintiffs' ignorance of the representation's falsity; Plaintiffs' rightful reliance on the truth of the representation; and proximate injury. Norden v. Friedman, 756 S.W.2d 158, 164 (Mo. 1988); see Nazami v. Patrons Mut. Ins. Co., 910 A.2d 209, 214 (Conn. 2006) (noting that a fraud claim requires proof that (1) the defendant made a false representation as a statement of fact, (2) the defendant knew the statement was untrue, (3) the defendant made the

---

[2]Missouri residents Craig Outdoor, Midwest Outdoor, and Massood asserted their state-law claims under Missouri law; Patriot Outdoor, a Connecticut resident, asserted its state-law claims under Connecticut law.

statement to induce reliance, and (4) the other party relied on the statement to his detriment).

In addition to claims that Viacom fraudulently misrepresented the review process, Plaintiffs also asserted that Viacom's failure to disclose the true nature of the review process constituted a fraudulent omission. Viacom argues that the fraudulent-omission theory should not have been submitted to the jury because, "as a matter of law, Viacom had no duty to disclose" the existence or details of its review process. Br. of Viacom at 31. Under Missouri and Connecticut law, silence may constitute a representation for purposes of a fraud claim if the party sought to be held accountable for fraud conceals material facts that he had a legal duty to disclose. VanBooven v. Smull, 938 S.W.2d 324, 328 (Mo. Ct. App. 1997) (per curiam); Ceferatti v. Boisvert, 77 A.2d 82, 84 (Conn. 1950). A legal duty to disclose may arise from a relationship of trust or confidence, an inequality of condition, or superior knowledge that is not reasonably available to the other party. VanBooven, 938 S.W.3d at 328; see Glazer v. Dress Barn, Inc., 873 A.2d 929, 961–62 (Conn. 2005). Under Connecticut law, whether a duty to disclose exists is a question of law. See Glazer, 873 A.2d at 961. Under Missouri law, "'[w]hether or not a duty to disclose exists . . . must be determined on the facts of the particular case.'" Hess v. Chase Manhattan Bank, USA,, 220 S.W.3d 758, 765 (Mo. 2007) (quoting Ringstreet Northcrest, Inc. v. Bisanz, 890 S.W.2d 713, 720 (Mo. Ct. App. 1995)). Before we consider the sufficiency of the evidence to support the jury's fraud verdicts, we will address Viacom's argument that it had no duty to disclose details of the review process.

First, the evidence established that Viacom possessed superior knowledge with respect to its review process. Viacom had been engaged by the railroads to operate as their leasing agent and was, by virtue of that position, the gatekeeper for billboard site applications. Plaintiffs, as applicants for railroad billboard sites, had no choice but to submit their applications, including detailed descriptions of site locations, to Viacom for processing. And only Viacom was in a position to know that its

application-processing procedures included an internal review by a local Viacom office and a determination by that office of whether a particular site should be appropriated by Viacom or released to an applicant. Kelly testified that Viacom employed a first-come, first-served policy for railroad billboard applications *except* in areas where Viacom operated, in which case applications would be reviewed by the local office. See, e.g., Tr. at 1464.

Second, the evidence established that Viacom's superior knowledge of the review process was not reasonably available to Plaintiffs. Viacom did not inform Plaintiffs that their applications would be subjected to the review process. Nor did Viacom inform Plaintiffs that the sites identified in their applications could be appropriated by Viacom if the site was deemed desirable by a local office. Plaintiffs and other applicants, as well as representatives from the railroads, testified that as far as they knew, Viacom was operating strictly as an agent for the railroads in processing these applications and not as a competitor for the sites. Jim Boeh (Midwest Outdoor), Mark Derench (Patriot Outdoor), and Craig Fedynich (Craig Outdoor) testified that they asked Viacom employees whether competing applications had already been submitted for their proposed sites, and they were told that no such applications had been received. Id. at 605–06; 239–40; 420. Viacom did not inform Boeh, Derench, or Fedynich that their applications would be reviewed and that their sites could be appropriated by Viacom. Accordingly, Boeh, Derench, and Fedynich submitted applications with the understanding that Viacom would process those applications on a first-come, first-served basis. Viacom argues that it had no duty to disclose its review process because it was operating as a competitor in an arm's-length transaction for any given site. This argument was rejected by the jury, which credited Plaintiffs' testimony that they submitted their applications to Viacom because Viacom was the leasing agent of the railroads, and they did not consider Viacom a competitor with respect to their site applications. In these circumstances, we conclude that Viacom possessed superior—indeed sole—knowledge of the review process and that this information was material and was not reasonably available to Plaintiffs. Thus,

Viacom had a duty under both Connecticut and Missouri law to disclose such information.

We now address Viacom's claims that the evidence was insufficient to support the jury's verdicts on Plaintiffs' fraud claims. The jury heard testimony from Derench that in the spring of 2002, he inquired of Tom Rende, a Viacom employee, whether Viacom had received any applications for billboard sites in the general vicinity of two sites Derench had identified on Boston and Maine ("B&M") railroad property along I-84 in Waterbury, Connecticut. Rende assured Derench that there had been no such applications. Based on this discussion, Derench, on behalf of Patriot Outdoor, submitted his applications, believing that he would be first in line for the billboard sites identified therein. Derench also testified that when he inquired about the status of his applications, Rende assured him that they were under consideration by the railroad when, according to Derench, the applications had not been forwarded to B&M and were instead under review by Viacom's local office for possible appropriation by Viacom. Derench further testified that based on Rende's repeated assurances that his site applications were being considered by B&M, Derench did not pursue potential sites on nearby, privately-owned property. See Tr. at 704 ("I would have [gone] next door . . . and gone to the south side."). Eventually, Derench was awarded one of the sites he had identified, and Viacom awarded the other site to itself. The jury was entitled to conclude from this evidence that (1) Rende misled Derench into submitting site applications by implying to Derench that Viacom employed a first-come, first-served policy; (2) pursuant to Viacom's undisclosed review process, Rende forwarded Derench's applications to Viacom's offices for internal review; (3) Rende falsely assured Derench that his applications had been submitted to the railroad; and (4) Viacom eventually appropriated one of the sites identified by Derench. Based on the evidence submitted, we cannot say that no reasonable jury could have found Viacom liable with respect to Patriot's Connecticut fraud claims.

The jury heard testimony that in September 2001, Boeh, on behalf of Midwest Outdoor, submitted applications for two potential billboard sites on Kansas City Southern ("KCS") railroad property along Highway 150 in Missouri. Prior to submitting these applications, Boeh contacted Viacom employee Randy Romig, who stated that there were no applications pending for sites in that area and that "it was first-come, first-served, and that if [Boeh was] there first, the location would likely be" his. Tr. at 230. Despite the apparent absence of competing applications, no action was taken on Boeh's applications for the remainder of 2001 and most of 2002. Boeh called Viacom numerous times inquiring about the delay, and Rende told Boeh that the railroad, not Viacom, was responsible for the holdup. Unbeknownst to Boeh, Rende had forwarded Boeh's applications to Viacom's Kansas City office pursuant to the internal review process. In the meantime, frustrated by the length of the delay and dissatisfied with the answers provided by Rende, Boeh contacted KCS directly in December 2002 and January 2003. The railroad told Boeh that it had approved one of the two sites months earlier. Assuming that one of his applications had all the necessary approvals, Boeh called Rende for an explanation regarding the delay in notification. Rende told Boeh that he would investigate. On March 21, 2003, however, Boeh received a letter stating that due to Boeh's "lack of activity" on the two site applications, Viacom had denied them both. Id. at 251. Only later did Boeh learn that Viacom had awarded one of the Highway 150 sites to itself while the second site was "spaced out"[3] by another competitor. Boeh testified that had he known the status of his applications, he "would have had the opportunity to go next door" to request permission to construct his billboard on property owned by a lumberyard. Id. at 312. The jury was entitled to conclude from this evidence that (1) Boeh was misled into submitting site applications by Romig's assurance that Viacom employed a first-come, first-served policy; (2) pursuant to Viacom's undisclosed review process, Boeh's applications were forwarded to Viacom's Kansas City office for internal review; (3)

---

[3]"Spaced out" as used in the billboard industry means that a particular billboard site is no longer viable due to its proximity to a later-constructed billboard or other structure.

Rende falsely implied to Boeh that his applications had been delayed by the railroad; (4) Boeh was falsely informed that his applications had been denied based on Boeh's inaction; and (5) Viacom eventually appropriated one of the sites identified by Boeh. Based on the evidence presented, a reasonable jury could have ruled in favor of Midwest Outdoor on its Missouri fraud claims.

The jury heard testimony that in June 2002, Fedynich, on behalf of Craig Outdoor, called Viacom's Kansas City office to inquire about the procedure for obtaining permission to construct a billboard on Burlington Northern Sante Fe Railway ("BNSF") property along I-670. Viacom's local representative, David Hyatt, told Fedynich that if Viacom received competing applications for a railroad site, "whoever applied first" would receive a permit. Id. at 420. Hyatt also told Fedynich that Viacom's "railroad management" function was "totally separate" from Viacom's outdoor billboard function and that the two departments "[didn't] share information" and "[did] not communicate." Id. On July 17, 2002, Fedynich applied for a site on the north side of I-670. On August 14, 2002, Viacom issued a letter authorizing Fedynich to pursue a state permit but cautioning that he could not begin construction on the site until Viacom forwarded his application to BNSF, the railroad approved the site, and Viacom issued a lease approval to Fedynich. On August 15, 2002, Fedynich submitted another application to Viacom for a site on railroad property along the south side of I-670. After this application was submitted, Hyatt told David Gilley, then a Viacom employee and later a whistleblower and Plaintiffs' witness, that the Kansas City office did not want Fedynich to obtain a permit for the south I-670 site because Viacom intended to relocate one of its existing billboards to a nearby location and did not want to be "spaced out." On August 22, 2002—one week after Fedynich submitted his application for the south I-670 site—Hyatt submitted an application for the same site on behalf of Viacom's Kansas City office. Viacom issued an authorization letter to Hyatt on the same day his application was submitted. On August 27, 2002, Fedynich received a letter from Viacom denying his application for the south I-670 site because of purported ongoing engineering concerns. Gilley

testified that the engineering-concerns rationale was a reference to a dispute between Viacom and BNSF over responsibility for paying an engineering firm's invoices that was nothing more than a "smoke screen" Viacom was using to delay applications. Id. at 106. In contrast, Viacom presented testimony that the dispute with BNSF over the engineering invoices was the true cause for delay in processing site applications, including Fedynich's. While Fedynich's I-670 applications were pending, local ordinances regarding the spacing of billboards at his proposed locations changed, and Fedynich was thereafter prevented from constructing billboards at the sites he originally identified. Fedynich testified that if he had known about Viacom's review process, he "would probably [have gone] next door to the . . . property owner" or "to another railroad" to apply for permission to construct his billboards. Id. at 450. The jury was entitled to conclude from this evidence that (1) Hyatt misled Fedynich into submitting site applications by telling him that Viacom employed a first-come, first-served policy and kept its railroad management and billboard operations separate; (2) pursuant to Viacom's undisclosed review process, Hyatt reviewed Fedynich's applications on behalf of Viacom's Kansas City office; (3) Viacom denied Fedynich's applications based on an artificial "engineering concerns" rationale; and (4) Viacom eventually appropriated the sites identified by Fedynich. Based on this evidence, a reasonable jury could have arrived at a verdict against Viacom with respect to Craig Outdoor's Missouri fraud claims.

Considering the evidence in the light most favorable to the jury verdict, assuming all conflicts in the evidence were resolved in Plaintiffs' favor, and giving Plaintiffs the benefit of all reasonable inferences that may be drawn from the evidence, we conclude that the jury's verdict on Plaintiffs' state-law fraud claims was supported by the evidence.[4]

---

[4]Viacom correctly notes that when one of two theories of liability has been erroneously submitted to the jury, a general verdict—as was returned in this case—cannot stand. See Dudley v. Dittmer, 795 F.2d 669, 673 (8th Cir. 1986). Because we have concluded that both fraud theories were properly submitted to the

*B. Evidentiary Issues.* Viacom challenges several of the District Court's evidentiary rulings. First, Viacom argues that the District Court erred by permitting Mike Twidle, an employee of Guilford Transportation, the parent company of B&M railroad, and David Schneider, an employee of BNSF railroad, to testify regarding their understanding of the relationship between Viacom and their respective railroad employers. Neither Twidle nor Schneider was called to testify as an expert witness, and Viacom argues that it was improper to permit these witnesses to testify to Viacom's contractual relationship with the railroads, such testimony being irrelevant and unfairly prejudicial. Plaintiffs respond that the lay-opinion testimony of Twidle and Schneider was admissible to rebut the testimony of the Viacom witnesses who asserted that Viacom's agreements with the railroads gave Viacom the unfettered right to appropriate any railroad billboard site identified in an application submitted to Viacom. Viacom also asserts that the District Court erred by permitting site applicants other than Plaintiffs to testify regarding their experiences with Viacom during the application process, again arguing that this testimony was irrelevant and unfairly prejudicial.

We review a district court's evidentiary decisions for abuse of discretion, according such decisions substantial deference. Wactor v. Spartan Transp. Corp., 27 F.3d 347, 350 (8th Cir. 1994). A non-expert witness may testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701.

Twidle first described his employment experience and duties with the railroad, which included managing B&M's relationship with Viacom and reviewing billboard

---

jury, however, we need not address Viacom's arguments regarding the general verdict.

site applications forwarded by Viacom to the railroad for approval. Schneider testified regarding his experience in railroad real estate management, which included "sales, easements, leases, permits, [and] track leases" for BNSF, as well as billboard site review and approval. Tr. Vol. 7 Attach. D at 1. After establishing the witnesses' pertinent work experience and the bases for their opinions, Plaintiffs elicited testimony from Twidle and Schneider that it was industry practice for railroad leasing agents such as Viacom to employ a first-come, first-served policy with respect to railroad billboard site applications, that Viacom's internal review process was outside the industry norm and contrary to their expectations as representatives of their respective railroad employers, and that it was not fair for Viacom to surreptitiously review applications and appropriate sites.

It was within the District Court's discretion to admit the testimony of Twidle and Schneider: they had personal knowledge of the railroad billboard industry, their testimony was helpful to a clear understanding of the facts and issues presented in the case, and their testimony did not involve specialized scientific or technical knowledge. See Burlington N. R.R. Co. v. Nebraska, 802 F.2d 994, 1005 (8th Cir. 1986) (concluding that railroad executives' lay-opinion testimony was admissible because it was based on their "knowledge derived from supervising railroad operations, years of experience in the industry, and review of employee accident reports prepared in the ordinary course of business"). Furthermore, we agree with Plaintiffs that this testimony was properly admitted to refute the testimony of Viacom witnesses who opined that Viacom's review process was permissible under the terms of Viacom's contracts with the railroads. See Gossett v. Weyerhaeuser Co., 856 F.2d 1154, 1156 (8th Cir. 1988) (noting district court's discretion to permit a plaintiff to negate in rebuttal, as opposed to case in chief, facts and theories raised by defense). The District Court's decision to admit Twidle and Schneider's lay-opinion testimony was not an abuse of its considerable discretion.

Viacom also challenges the District Court's decision to permit site applicants other than Plaintiffs to testify regarding their experiences with Viacom during the application process. Viacom argues that this evidence was irrelevant and unfairly prejudicial. We disagree. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. All relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "A district court is afforded wide latitude in determining issues of relevancy . . . ." Suggs v. Stanley, 324 F.3d 672, 682 (8th Cir. 2003).

John Lockridge, Nathan Simmons, Steve Anderson, and Joseph Murray, each a billboard business owner, testified that their applications for railroad billboard sites were subjected to the same undisclosed internal review process that Viacom conducted on Plaintiffs' site applications.[5] Lockridge testified that after Viacom failed to explain the delay in processing his site applications, he contacted Norfolk Southern railroad directly and only then learned that the railroad had approved his applications months earlier. Plaintiffs proffered copies of Lockridge's site applications on which a Viacom employee had noted, "Atlanta has interest. Atlanta to research" the sites identified by Lockridge. Tr. at 945–46. Simmons testified that he applied to Viacom for six sites on property in Georgia owned by CSX railroad, but was informed by Viacom that permits had already been issued to another applicant for five of those six sites. When Simmons later researched the sites with the Georgia Department of Transportation, he discovered that no permits had been issued. In fact, CSX had

_____

[5]This evidence was relevant and admissible not only to support Plaintiffs' allegations of fraud, see Norden v. Friedman, 756 S.W.2d 158, 164 (Mo. 1988); Nazami v. Patrons Mut. Ins. Co., 910 A.2d 209, 214 (Conn. 2006), but also to show a pattern of racketeering activity, a necessary element of Plaintiffs' RICO claims.

approved four of Simmons's site applications, but Viacom had not notified Simmons that he had received railroad approval. Consequently, Simmons testified, he was prevented from building on those sites. Anderson testified that he submitted applications to Viacom for three railroad billboard sites in October 2001. Viacom reviewed those applications and thereafter obtained permission from the railroad to construct a billboard that effectively "spaced out" two of the sites identified by Anderson. Murray testified that he applied to Viacom's predecessor for two billboard sites along Amtrak property in Boston. Once Viacom took over, Murray's applications were stalled, and when Murray contacted Amtrak officials for an explanation, he was told that Viacom officials had instructed Amtrak officials "not to talk" to Murray about the applications. Id. at 1271. After Murray filed a lawsuit against Amtrak and Viacom, his applications were approved, and Murray dropped his lawsuit.

The District Court rejected Viacom's objections that this testimony was irrelevant and unfairly prejudicial. We likewise reject Viacom's arguments. In short, the District Court was in the best position to determine the relevance and potential prejudice of the evidence regarding Viacom's conduct in processing the applications submitted by Lockridge, Simmons, Anderson, and Murray, and we cannot say that the court abused its considerable discretion by admitting this testimony.

*C. Damages Issues—Fraud.* Viacom next argues that because Plaintiffs failed to satisfy the elements necessary to recover on a benefit-of-the-bargain damages theory, the damages awarded by the jury on Plaintiffs' fraud claims were not recoverable as a matter of law. Plaintiffs respond that Viacom misstates their theory of recovery and thereby misconstrues the basis on which the jury's damages award rests.

The District Court based its damages instruction on Missouri Approved Jury Instruction (MAI) 4.01, which states:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained [and is reasonably certain to sustain in the future] as a direct result of the occurrence mentioned in the evidence.

Mo. Supreme Court Comm. on Jury Instructions, Missouri Approved Jury Instructions 48 (Stephen H. Ringkamp & Richard E. McLeod eds., West 6th ed. 2002) (footnote omitted).

Viacom correctly notes that in a case alleging fraud, a court typically charges the jury with a benefit-of-the-bargain instruction—described in MAI 4.03—as the correct measure of damages. See Heberer v. Shell Oil Co., 744 S.W.2d 441, 443 (Mo. 1988); see also Leisure Resort Tech., Inc. v. Trading Cove Assocs., 889 A.2d 785, 793 (Conn. 2006). What Viacom fails to note, however, is that the use of other measures of damages may be permitted where the peculiar circumstances of the fraud make benefit-of-the-bargain damages an inadequate or inappropriate measure. See Cent. Microfilm Serv. Corp. v. Basic/Four Corp., 688 F.2d 1206, 1220 (8th Cir. 1982) (applying Missouri law), cert. denied, 459 U.S. 1204 (1983); Schroeder v. Zykan, 255 S.W.2d 105, 110–11 (Mo. Ct. App. 1953); Kilduff v. Adams, Inc., 593 A.2d 478, 480, 483 (Conn. 1991) (affirming award of "economic damages" on fraud claim where plaintiffs did not pursue options to protect home from foreclosure because defendant lienholder said he did not intend to foreclose and noting that plaintiff was entitled to recover consequential damages resulting directly from fraud). The District Court did not instruct the jury on benefit-of-the-bargain damages because, according to Plaintiffs, they did not proceed on a benefit-of-the-bargain theory. Rather, the court instructed the jury to award fair and just compensation for the harm suffered by Plaintiffs on account of Viacom's culpable conduct. If Viacom believed that the court's damages instruction was an improper statement of Plaintiffs' theory of recovery or was otherwise in error, it was Viacom's obligation to object—and Viacom did not

do so.[6]  Fed. R. Civ. P. 51(d)(1)(A) (noting that a party may assert an instructional error only if that party "properly objected"); Dupre v. Fru-Con Eng'g Inc., 112 F.3d 329, 334 (8th Cir. 1997) ("Our law on this subject is crystal clear: to preserve an argument concerning a jury instruction for appellate review, a party must state distinctly the matter objected to and the grounds for the objection on the record."). We perceive no error in the District Court's instructions to the jury on Plaintiffs' damages claim.

Viacom faults the admission of Plaintiffs' testimony regarding the monetary effect of Viacom's conduct on their businesses.  Specifically, Viacom contends that the District Court improperly permitted Plaintiffs to testify about the value of the billboards they were prevented or restricted from erecting as a result of Viacom's fraudulent conduct.  Testimony on this subject, according to Viacom, requires specialized, expert knowledge.  We have considered Viacom's arguments and find them unpersuasive.  A district court's evidentiary rulings are entitled to substantial deference, so we review such rulings only for abuse of discretion.  Wactor, 27 F.3d at 350; see Spencer v. Young, 495 F.3d 945, 950 (8th Cir. 2007) (noting that federal evidentiary rules provide standards for admissibility of evidence in diversity cases). A business owner may be permitted to testify to the damage he perceives has been done to his business as the result of another's actions.  See e.g., BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 963 (8th Cir. 2003) (concluding that district court did not abuse its discretion by admitting damages testimony from business owner with thirteen years' experience in industry).  Viacom had the opportunity to present its own evidence to refute the Plaintiffs' damages evidence.  See, e.g., Spencer v. Stuart Hall Co., 173 F.3d 1124, 1128 (8th Cir. 1999) ("Where conflicting evidence is presented at trial, it is the jury rather than this court which assesses the credibility of the witnesses and decides which version to believe.").  Moreover, as discussed above,

---

[6]Viacom objected to Jury Instructions 14, 16, 21, 22, 23, 24, 25, 27, 28, 31, 33, 35, and 37 but not to Instruction 48—the District Court's instruction on damages.

Viacom did not object to the District Court's jury instruction regarding the calculation of damages. In sum, we believe that Plaintiffs presented a submissible case on the issue of damages related to their fraud claims and that there was ample evidence presented at trial to support Plaintiffs' fraud theories. The District Court did not err in its instructions to the jury on the calculation of damages, and the jury's damages award was supported by the evidence.

*D. Tortious-Interference Issues.* Viacom next argues that Plaintiffs' tortious-interference claims amount to impermissible contentions that Viacom interfered with its own contracts.[7] The District Court instructed the jury that Plaintiffs could prevail on their tortious-interference claims only if they proved that (1) each had a valid reasonable prospect of obtaining permission to build, sell, or lease billboards on railroad property; (2) Viacom was aware of each Plaintiff's expectation or opportunity; (3) Viacom unjustifiably interfered with each Plaintiff's expectation or opportunity; and (4) each Plaintiff suffered damages as a result. Instr. No. 35. Viacom did not object to this instruction at trial, and Viacom does not attempt to raise such an objection on appeal. Rather, Viacom argues that the evidence was insufficient to support the jury's verdict on this claim.[8] As noted previously, we will reverse a jury's verdict only if, "after viewing the evidence in the light most favorable to the verdict,

---

[7]Viacom suggests that the jury instruction on tortious interference required that Plaintiffs prove "a reasonable probability of obtaining permission <u>from Viacom</u>" to build, sell, or lease billboards. Br. of Viacom at 48. This characterization of the jury instruction is incorrect. The instructions required Plaintiffs to show that they had "a reasonable prospect of obtaining permission to build billboards on the sites [they] identified in [their] applications." Instrs. 35, 36. The jury instructions did not require proof of permission "from Viacom."

[8]Because we have affirmed the jury's verdict on Plaintiffs' fraud claims, we need not address Viacom's arguments that the failure of Plaintiffs' fraud claims requires reversal of the jury's verdict on Plaintiffs' tortious-interference claims.

we conclude that no reasonable juror could have returned a verdict" for Plaintiffs. Ryther, 108 F.3d at 836.

Contrary to Viacom's assertions, Plaintiffs were not seeking a business relationship with Viacom, except to the extent that Plaintiffs expected Viacom to fulfill its role as an agent of the railroads, forward Plaintiffs' site applications to the appropriate railroad for consideration, inform Plaintiffs of the railroad's decision, and issue any necessary permits in conformance with the railroad's approval of the proposed site. Plaintiffs were seeking business relationships with the railroads—the actual owners of the property on which Plaintiffs wished to obtain permission to construct billboards. Plaintiffs' evidence established that Viacom misled them into believing that Viacom—an agent of the railroads—employed the industry-standard first-come, first-served method for processing applications when, in fact, Viacom was surreptitiously reviewing site applications, improperly delaying action on those applications, and appropriating those billboard sites that Viacom considered financially or strategically desirable. The evidence supported the jury's finding that Viacom recognized the commercial potential in the sites identified by Plaintiffs and, in an effort to exploit that potential, prevented or delayed Plaintiffs from obtaining permission to construct billboards on those sites. Viacom argues that Plaintiffs failed to identify a single potential purchaser or advertiser for the billboards Plaintiffs sought permission to construct. In both Missouri and Connecticut, however, all that is required is proof of a *reasonable probability or expectancy* of entering into a business relationship—as opposed to an actual business relationship—to establish the proof necessary to support a tortious-interference claim. See Am. Bus. Interiors, Inc. v. Haworth, Inc., 798 F.2d 1135, 1143 (8th Cir. 1986) (applying Missouri law); Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc., 298 F. Supp. 2d 276, 287 (D. Conn. 2004) (applying Connecticut law). Plaintiffs satisfied their burden of proof.

Viacom also argues that pursuant to the jury instructions, Plaintiffs had to prove that Viacom was aware of a Plaintiff's intent to *build* on a particular site. According to Viacom, proof that Viacom was aware of a Plaintiff's intent to *resell* a site to a third party rather than construct a billboard itself was inadequate to prove tortious interference. We reject this argument. The jury was instructed to return a verdict for Plaintiffs on their tortious-interference claim if Plaintiffs had a valid business expectation or opportunity "to gain financial benefits from *leasing or selling* the proposed billboard sites." Instr. No. 35 (emphasis added). The jury reasonably concluded that Plaintiffs satisfied this element of their claim. Based on our review of the record, we cannot fault this conclusion.

In short, Plaintiffs presented sufficient evidence for a reasonable jury to conclude that had Viacom properly fulfilled its role as an agent of the railroads, Plaintiffs would have had a reasonable opportunity to enter into a business relationship with the railroads to construct billboards on the sites at issue. Accordingly, we decline to reverse the jury's verdict on Plaintiffs' tortious-interference claim.

*E. Unfair-Competition Issues.* Viacom contends that Plaintiffs failed to prove the elements of their unfair-competition claim, namely, that Plaintiffs communicated a trade secret to Viacom, Viacom was in a position of trust and confidence with Plaintiffs, and Viacom used the trade secret, thereby causing Plaintiffs damage. Instr. No. 37. Again, Viacom asks us to reverse the jury's verdict, an extreme remedy that we will grant only if, after viewing the evidence in the light most beneficial to Plaintiffs, we conclude that no reasonable jury could have returned a verdict in Plaintiffs' favor. See Ryther, 108 F.3d at 836.

According to Viacom, Plaintiffs and Viacom were engaged in arm's-length business relationships with respect to the billboard sites at issue. Therefore, Viacom was not in a position of trust and confidence with Plaintiffs and their claims must fail.

We disagree with Viacom's characterization of its relationship with Plaintiffs. As discussed above, Plaintiffs interacted with Viacom as a matter of necessity because Viacom represented itself as the agent of the railroads for billboard-construction permits. Plaintiffs reasonably relied on Viacom to treat their site applications in good faith, forward those applications to the railroads in a timely fashion, notify Plaintiffs of a railroad's decision, and issue any necessary permits in accordance with that railroad's decision. See Steinberg v. Fleischer, 706 S.W.2d 901, 908 (Mo. Ct. App. 1986) (reasoning that parties were "experienced businessmen" and did not have a fiduciary relationship); Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 761 A.2d 1268, 1279–80 (Conn. 2000) (defining an arm's-length business relationship as lacking a relationship of dominance and dependence). Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence was sufficient for a reasonable jury to find that Viacom was in a position of trust and confidence with Plaintiffs with respect to the site applications.

Viacom next argues that Plaintiffs failed to prove that they communicated trade secrets when they identified their proposed billboard sites in applications submitted to Viacom. Rather, according to Viacom, these sites were public knowledge easily identifiable by any billboard-industry professional. While it may be true that easily ascertainable information does not constitute a trade secret, see W. Forms, Inc. v. Pickell, 308 F.3d 930, 933–34 (8th Cir. 2002) (applying Missouri law); Town & Country House & Homes Serv., Inc. v. Evans, 189 A.2d 390, 393 (Conn. 1963), the testimony in this case was sufficient for the jury to conclude that a billboard professional discovers desirable urban billboard sites on railroad property only after extensive, time-consuming research and such information is entitled to protection. Viacom also argues that Plaintiffs made no effort to maintain the secrecy of their billboard sites because Plaintiffs disclosed the locations of those sites in their applications. This argument is without merit. Plaintiffs disclosed the site locations because they were required to do so in order to obtain permission to construct billboards on those sites. Viewing the evidence in the light most favorable to

Plaintiffs, we cannot say that the evidence was insufficient for a reasonable jury to find that Plaintiffs communicated trade secrets in their applications to Viacom for the railroad billboard sites at issue.

Viacom also argues that Plaintiffs' unfair-competition claims fail because Viacom did not "use the I-84 and I-670 sites in any way, let alone to cause Plaintiffs harm." Br. of Viacom at 55. We disagree. The evidence was sufficient to establish that Viacom "used" the billboard sites identified by Plaintiffs by, among other things, constructing Viacom billboards on those sites, delaying notification to Plaintiffs after a railroad approved a proposed site, or "spacing-out" Plaintiffs' proposed sites by constructing billboards nearby. The jury found that these wrongful activities caused Plaintiffs to suffer economic damage. The jury heard Viacom's evidence to the contrary that, for example, a "logjam" of pending applications at BNSF caused delay in processing applications, that Plaintiffs' failure to comply with local billboard-spacing regulations caused the denial of their applications, and that Derench's alleged forgery in a state license application caused him to lose one of the sites he identified. Having heard all the evidence, the jury elected to credit Plaintiffs' testimony over Viacom's on these issues. See Spencer, 173 F.3d at 1128 (noting that the jury, not this court, resolves conflicts in evidence). Mindful of our extremely deferential standard of review for jury verdicts, we cannot say that the jury's verdict on Plaintiffs' unfair-competition claim was unsupported by the evidence.

*F. Punitive-Damages Issues.* Viacom raises a number of claims with respect to the jury's award of punitive damages. First, Viacom argues that the punitive-damages award must be reversed because there was no evidence of an "evil motive" on Viacom's part. The instructions required, however, that Plaintiffs prove conduct that was "outrageous" *either* "because of [Viacom's] evil motive" *or* because of Viacom's "reckless indifference to the rights of others." Instr. No. 50. The jury was presented with substantial evidence to support its findings that Viacom, allegedly acting in its capacity as an agent for the railroads, either 1) fraudulently represented

-22-

to Plaintiffs that their applications would be processed on a first-come, first-served basis or 2) failed to disclose to Plaintiffs—or even flatly denied—that Viacom would review Plaintiffs' applications and potentially appropriate the sites identified therein. Plaintiffs also presented evidence sufficient for a jury to conclude that Viacom engaged in this conduct for its financial and strategic benefit. The evidence of Viacom's outrageous conduct in pursuit of its scheme was sufficient for a reasonable jury to award punitive damages.

Next, Viacom contends that under Connecticut law, Patriot could not recover punitive damages because it failed to prove that a managerial-level Viacom employee engaged in culpable conduct. See Stohlts v. Gilkinson, 867 A.2d 860, 873–74 (Conn. Ct. App. 2005) (noting that an employer may be liable for punitive damages if a managerial-level employee engages in or approves of an outrageous act). Here, both Wally Kelly, the President of Viacom, and Harold Gustin, a Senior Vice President of Viacom's Land-Lease Division, conceded that the railroad billboard industry generally processes site applications on a first-come, first-served basis. Kelly and Gustin also testified that Viacom's adoption of the review process amounted to an internal business decision that Viacom was not required to share with site applicants. Kelly testified that he implemented the application review process in 2002 and that he believed the review process was appropriate and permissible under Viacom's contracts with the railroads. Gilley testified that he forwarded for review a list of billboard sites originally identified in third-party applications "in accordance with [Kelly's] directive that the local markets be given a chance to review them for Viacom's use." Tr. at 85 (quoting memo from Gilley to Viacom employees forwarding BNSF sites identified in applications received by Viacom). This evidence was sufficient to establish that at a minimum, local-office managerial-level employees engaged in or condoned the conduct required to support a punitive-damages award.

Viacom also argues that Patriot cannot recover punitive damages because it failed to present evidence of its litigation expenses to the jury as required under

Connecticut law. See Gagne v. Town of Enfield, 734 F.2d 902, 904 (2d Cir. 1984) (citing Connecticut law under which punitive damages recoverable in some circumstances but are limited to the plaintiff's litigation expenses). Over Viacom's objections, the District Court allowed Patriot to present evidence of its litigation expenses to the court after the jury had returned its verdict. Patriot's counsel attempted to introduce litigation-expense evidence during the trial, but the court ruled that it would allow such evidence "at some time, maybe even after the jury has gone out to deliberate, because it doesn't go to the jury. It just has to be in evidence in the plaintiffs' case." Tr. at 1733. There was additional discussion and legal argument among counsel and the court, and Viacom's counsel ultimately stated that the court's "approach [was] just fine." Tr. at 1735. Because Viacom acquiesced in the District Court's approach to the introduction of evidence on Patriot's litigation expenses and did not object, Viacom has waived this argument on appeal. See Evergreen Invs., LLC v. FCL Graphics, Inc., 334 F.3d 750, 757 (8th Cir. 2003) (reiterating that a "party may not stand idly by, watching the proceedings and allowing the district court to commit an error on which the party subsequently complains" (citation to quoted case omitted)).

Finally, Viacom argues that the punitive damages awarded by the jury are unconstitutionally excessive. The jury awarded $1,044,445 in punitive damages each to Craig Outdoor and Midwest Outdoor, an amount that is eight times the actual damages of $125,000 awarded to each Plaintiff. We review de novo a district court's determination regarding the constitutionality of a punitive damages award. Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1048 (8th Cir. 2002). In deciding whether a punitive damages award is so excessive that it violates due process, we consider the reprehensibility of the defendant's conduct, the disparity between the plaintiff's harm and the punitive damages award, and the difference between the punitive damages award and the civil penalties imposed in comparable cases. BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996). The most important of these factors is the reprehensibility of the defendant's conduct. Id. Here, we agree with the

District Court that Viacom's conduct was particularly egregious, characterized as it was by "repeated trickery and deceit," with evidence indicating "an enormous company's intent to defraud Plaintiffs because of their limited financial abilities." Order of Dec. 14, 2005, at 10. Although a ratio of actual to punitive damages in excess of eight to one may be constitutionally suspect, "there are no rigid benchmarks that a punitive damages award may not surpass." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003). We conclude that in this case, given Viacom's deceitful conduct directed at Plaintiffs, the single-digit multiplier comports with due process.[9] Cf. id. ("Our jurisprudence and the principles it has now established demonstrate . . . that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). In sum, we find no constitutional impediment to the enforcement of the punitive damages award as ultimately determined by the District Court.

## II. PLAINTIFFS & MASSOOD

*A. Damages Issues.* Having addressed Viacom's arguments on appeal, we turn now to Plaintiffs' and Massood's arguments on cross-appeal. Plaintiffs first contend that the District Court erred by refusing to harmonize the damages awards to reflect the jury's true intentions. The verdict forms provided separate blank lines on which to indicate the actual damages awarded to each Plaintiff under each theory of recovery, but the form did not provide a separate blank line on which to indicate the *total* actual damages awarded to each Plaintiff. The jury returned identical verdicts

---

[9]Viacom cites our decision in Eden Electric, Ltd. v. Amana Co., 370 F.3d 824, 828–29 (8th Cir. 2004), cert. denied, 543 U.S. 1150 (2005), for its proposition that in a commercial case alleging particularly egregious behavior, a punitive-damages multiplier of roughly 4:1 is the constitutional maximum. We disagree with Viacom's contention that its behavior in this case was not particularly egregious, and we reject Viacom's argument that a 4:1 multiplier is the constitutional maximum in every commercial case. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003).

against Viacom on each Plaintiff's three state-law claims (fraud, tortious interference, and unfair competition), and the jury assessed identical actual damages under each of the three theories asserted by each Plaintiff: $125,000 for Craig, $125,000 for Midwest, and $80,000 for Patriot.[10]

After the verdict was returned, Viacom filed a motion seeking formation of the judgment, arguing that because there was a single indivisible injury in the case—the value of the lost and appropriated billboard sites—"entering judgment on the jury's separate damages findings would create impermissible double recovery for Plaintiffs." Defendants' Motion Regarding Formation of Judgment at 1. Plaintiffs filed a response to Viacom's double-recovery arguments, including affidavits they had obtained from each juror to "clear[] up any possible ambiguity created by the form of the verdict." Plaintiffs' Statement Concerning the Jury's Verdict and Motion for Final Judgment at 1. Plaintiffs argued that the verdict forms confused the jury and caused it to mistakenly apportion the total actual damages for each Plaintiff across all three theories each Plaintiff asserted. To give the jury's true intentions effect, the damages amount noted for each separate theory of recovery must be totaled. For example, as to the verdict for Craig Outdoor, Plaintiffs asserted that the jury intended to award actual damages of $125,000 for *each* of Craig's state-law theories for a total recovery of $375,000. The District Court refused to consider the juror affidavits and rejected Plaintiffs' arguments. Instead, the court entered judgment for total actual damages on the state-law claims in the following amounts: $125,000 for Craig Outdoor; $125,000 for Midwest Outdoor; and $80,000 for Patriot. Plaintiffs appeal this result.

We first address the issue of the juror affidavits. Plaintiffs' counsel obtained these affidavits after the jury was discharged, without notice to opposing counsel, and without permission from the District Court. A district court is generally prohibited

---

[10]Because we reverse the jury's verdict on Plaintiffs' RICO claims against Gustin and Kelly, we need not address Plaintiffs' arguments regarding the calculation of the RICO damages awarded pursuant to those verdicts.

from receiving testimony from jurors after the jury has returned a verdict and has been discharged. Fed. R. Evid. 606(b); Karl v. Burlington N. R.R. Co., 880 F.2d 68, 73 (8th Cir. 1989). A district court may, however, consider juror testimony that because of some oversight or mistake, the verdict announced at trial was not the verdict on which the jurors had agreed. Karl, 880 F.2d at 74. In other words, "[t]he admission of a juror's testimony is proper to indicate the possibility of a 'clerical error' in the verdict, but not the 'validity' of the verdict." Id. (citation to quoted case omitted). Clerical error might involve, for example, a transposed number in the damages amount set forth on the verdict form. Here, Plaintiffs' charges of mistake or ambiguity in the verdict form cannot be characterized as clerical error. Instead, the affidavits obtained by Plaintiffs purport to explain what the jury meant by its verdict and how the jury determined what numbers to transcribe onto the verdict forms. See id. The District Court did not err in refusing to consider the juror affidavits.

We next address Plaintiffs' assertions that the District Court erred by refusing to harmonize the jury's damages awards. If, as here, a party asserts alternative theories of recovery for the same injury, that party may not recover compensatory damages under each legal theory. Rather, he is only entitled to one compensatory damage award if liability is found on any or all of the theories asserted. Cole v. Control Data Corp., 947 F.2d 313, 320–21 (8th Cir. 1991) (applying Missouri law). The parties agree that each Plaintiff asserted three state-law theories of relief for a single injury: the harm caused by Viacom's scheme to defraud Plaintiffs out of billboard sites identified in applications submitted to Viacom. Whether the harm caused by Viacom's scheme was the result of fraudulent misrepresentation or omission, unfair competition, tortious interference, or some combination thereof, the parties agree that there is only a single indivisible injury to each Plaintiff and that there may be only a single recovery awarded to each Plaintiff. See Sellers v. Mineta, 350 F.3d 706, 713–14 (8th Cir. 2003) ("The law in Missouri is that a plaintiff may not recover duplicate damages for the same harm."); Mahon v. B.V. Unitron Mfg., Inc., 935 A.2d 1004, 1015 (Conn. 2007) ("Connecticut courts consistently have upheld and endorsed the principle that

a litigant may recover just damages for the same loss only once." (citation to quoted cases omitted)).

We agree with the District Court that "[f]rom the face of the verdict forms," the jury intended to award total actual damages of $125,000 to Craig Outdoor and Midwest Outdoor and $80,000 to Patriot for their respective state-law claims. Order of Dec. 14, 2005, at 4. Nothing in the jury instructions or the verdict forms directed or permitted the jury to allocate the total actual damages amount awarded to a Plaintiff among that Plaintiff's three state-law claims. "Absent evidence to the contrary we presume the jury followed the instructions it was given." Sloan v. Motorists Mut. Ins. Co., 368 F.3d 853, 856 (8th Cir. 2004). And we are not persuaded by Plaintiffs that "the only logical and consistent" reading of the verdict forms requires a conclusion that the jury allocated the total actual damages among each Plaintiff's three state-law claims. Br. of Appellees at 71. We likewise reject Plaintiffs' argument that the verdict forms—forms, we note, that were proposed by Plaintiffs and adopted by the court—confused the jury and caused it to improperly allocate the actual damages awards. "[M]ere speculation that a jury verdict may have been based on the jury's own misunderstanding of the law, even though properly instructed, is an insufficient basis on which to upset a jury verdict." Gander v. FMC Corp., 892 F.2d 1373, 1379 (8th Cir.), cert. denied, 498 U.S. 878 (1990). In sum, we conclude that the District Court did not err in rejecting Plaintiffs' calls to harmonize the jury's actual damages awards on Plaintiffs' state-law claims.

Patriot argues that the District Court erred by capping its punitive-damages award at $50,000. According to Patriot, the punitive-damages award is insufficient to make it whole as required by Connecticut law because Patriot's obligation under its contingency-fee arrangement with its attorneys—forty percent of Patriot's total recovery plus expenses—exceeds the sum of Patriot's share of the RICO-damages award plus the $50,000 punitive-damages award after imposition of the cap. Thus, Patriot argues, because it owes more in attorney fees than it will recover, the punitive

damages permitted by the District Court are insufficient under Connecticut law. Viacom counters that the District Court properly set the punitive-damages cap because Connecticut law allows a court to award reasonable attorney fees no matter the terms of a contingency-fee agreement. See Ham v. Greene, 729 A.2d 740, 756 (Conn.) (affirming district court's punitive damages award even though amount was less than that calculated under contingency-fee agreement), cert. denied, 528 U.S. 929 (1999); Berry v. Loiseau, 614 A.2d 414, 437 (Conn. 1992) (concluding that court was not bound by contingency-fee agreement in calculating punitive damages under state statute).

We conclude that the District Court abused its discretion in setting the cap on Patriot's punitive-damages award at an amount that is insufficient to cover its litigation expenses as expressed in the contingency-fee agreement. In Schoonmaker v. Lawrence Brunoli, Inc., 828 A.2d 64, 104–05 (Conn. 2005), the Connecticut Supreme Court held that if a contingency fee "agreement is, by its terms, reasonable, the trial court may depart from its terms only when necessary to prevent 'substantial unfairness' to the party . . . who bears the ultimate responsibility for payment of the fee." On the other hand, if the trial court determines that the fee agreement is unreasonable on its face, the court "may exercise its discretion and award a reasonable fee in accordance with the factors enumerated in rule 1.5(a) of the Rules of Professional Conduct." Id. at 105. As we explain below, the RICO damages awarded by the jury to Patriot have been eliminated from the attorney-fees computation, and this result will likely affect the District Court's determination of the punitive-damages award. Accordingly, we reverse the judgment awarding Patriot $50,000 in punitive damages, and we remand to the District Court for reconsideration of this issue in light of our decision.

*B. Massood Issues.* Massood argues that the District Court erred in granting Viacom's motion to dismiss his RICO and state-law claims. We review de novo the District Court's order granting Viacom's motion to dismiss, affirming only if Massood

can prove no set of facts that would entitle him to relief.  Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 700 (8th Cir. 2003).

Massood's claims were based on the following events: In the summer of 1997, Viacom approached Massood about acquiring his billboard corporation, Wilson-Curtis.  Before the acquisition was finalized, Massood, on behalf of Wilson-Curtis, filed three billboard site applications with Viacom.  According to Massood, Viacom fraudulently denied these applications, thereby diminishing the value of, and the price Viacom paid for, Wilson-Curtis.  The acquisition was completed on January 21, 1999.  Thereafter, Massood filed these RICO and state-law claims against Viacom "to recover the loss he suffered as a result of the lost value in the Wilson-Curtis shares he owned."  First Amended Complaint at 14.

The District Court dismissed Massood's claims, noting that "a shareholder lacks standing to sue for injury to a corporation because the shareholder suffers only derivatively" through the decreased value of his investment.  Order of July 21, 2004, at 2.  A shareholder generally may not sue on his own behalf—under Missouri law or RICO—to recover the wrongful diminution in value of his stock or to recoup his share of money taken from the corporation; such claims must generally be pursued in a shareholders derivative action.  See Peterson v. Kennedy, 791 S.W.2d 459, 464 (Mo. Ct. App. 1990) (observing that diminution in stock value must be addressed in a derivative shareholders suit; shareholders may not sue individually to "recover their proportionate share of money alleged to have been wrongfully taken from the corporation"); Brennan v. Chestnut, 973 F.2d 644, 648 (8th Cir. 1992) (noting that a shareholder may not maintain a RICO action for injury to a corporation that resulted in the diminution in value of his shares without individual and direct injury to the shareholder); Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.), cert. denied, 479 U.S. 987 (1986) (same).

Massood argues that in the circumstances of this case, "[e]quity demands a different standing rule . . . [because] the fraudulent activity of the alleged wrongdoer (Viacom) enabled it to buy the tort victim corporation (Wilson-Curtis)" at a reduced price. Br. of Appellees at 89. In support of this contention, Massood cites several cases, but in none of those cases did the court permit the shareholder to recover individually for derivative claims. Rather, in those cases, the court permitted the shareholder, who continued to own shares in the surviving corporation, to pursue a derivative claim on behalf of the corporation that was acquired in the merger. See Blasband v. Rales, 971 F.2d 1034, 1046 (3d Cir. 1992) (applying Delaware law and holding that plaintiff who was a shareholder in surviving corporation could sue derivatively on behalf of its merged parent corporation); Mendell ex rel. Viacom, Inc. v. Gollust, 909 F.2d 724, 729 (2d Cir. 1990) (holding that in federal securities-law case, shareholder in surviving parent corporation had standing to pursue claims on behalf of merged subsidiary corporation); Keyser v. Commonwealth Nat'l Fin. Corp., 120 F.R.D. 489, 493 (M.D. Pa. 1988) (allowing shareholders to maintain a derivative action on behalf of merged entity and separate individual actions) (superseded by statute); Miller v. Steinbach, 268 F. Supp. 255, 268–69 (S.D.N.Y. 1967) (holding that plaintiff who was a shareholder in surviving corporation had "capacity to sue derivatively on behalf of" company that was merged into the surviving company).

We are not persuaded that in the circumstances of this case, equity demands that we permit Massood to assert his admittedly derivative claims for individual recovery. In several analogous situations, courts have refused to extend a derivative-standing exception to allow a shareholder (or former shareholder) to pursue *individually* claims that for some reason he could not have pursued derivatively. See, e.g., Warren v. Mercantile Bank of St. Louis, N.A., 11 S.W.3d 621, 623 (Mo. Ct. App. 1999) (holding that misrepresentation "claims based upon an agreement between two corporations and/or statements made to the officers or sole shareholders of a corporation belong to the corporation, not the individual officers or sole shareholders"; shareholder could not pursue individual claims for damages); Rand, 794 F.2d at 849 (concluding that

shareholders who alleged that creditor violated RICO by forcing corporation's involuntary bankruptcy lacked standing to sue creditor because legal injury, if any, was to corporation/bankruptcy trustee and not to shareholders); Lakonia Mgmt. Ltd. v. Meriwether, 106 F. Supp. 2d 540, 550–52 (S.D.N.Y. 2000) (concluding that shareholder lacked standing to assert derivative RICO claim in individual capacity, even though he could not bring the claim derivatively because he no longer owned shares in the company); Small v. Sussman, 713 N.E.2d 1216, 1221 (Ill. Ct. App. 1999) (reiterating that under Illinois law, if an alleged injury is to the corporation, any lawsuit must be brought on the corporation's behalf; fact that the corporation had been sold and was part of another entity did not change the derivative requirement).

Thus, several courts have held that a shareholder lacks standing to pursue derivative claims individually even where, as in this case, the shareholder could not have pursued a derivative action because he no longer held stock in the allegedly injured company or he was otherwise barred from bringing a derivative suit. We cannot say that the District Court erred in reaching a similar conclusion in the circumstances of this case. We are not suggesting that we may never be presented with a case in which equity demands an exception to the derivative-standing rule, but this is not such a case.[11] The District Court did not err in granting Viacom's motion to dismiss Massood's RICO and state-law claims against Viacom for lack of standing.

*C. RICO Issues—Viacom.* We now turn to Plaintiffs' arguments that Viacom violated RICO. Plaintiffs alleged that Viacom formed three separate RICO

---

[11]We note that Massood apparently knew about Viacom's alleged appropriation of the three Wilson-Curtis billboard sites roughly six months before he sold his Wilson-Curtis shares to Viacom. Thus, it appears that Massood could have brought a derivative action on behalf of Wilson-Curtis prior to the sale of his shares. See Lakonia Mgmt., 106 F. Supp. 2d at 551 n.20 (stating "no unfairness" in dismissing suit for lack of standing when former shareholder had knowledge of allegedly objectionable conduct before sale of shares and had opportunity to bring derivative action but did not).

association-in-fact enterprises with the BNSF, KCS, and B&M railroads "for the purpose of defrauding the plaintiffs and other small billboard businesses and their owners," in violation of RICO.  Complaint at 33.  Plaintiffs further asserted that while such associations in fact were "enterprises" as defined in RICO, each railroad was merely an innocent member of its respective enterprise.

The District Court granted Viacom's motion for summary judgment on these claims, concluding that "for an association of individuals to constitute an 'enterprise' for purposes of RICO, the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." Order of May 25, 2005, at 4 (emphasis added) (quoting Blue Cross of Cal. v. SmithKline Beecham Clinical Labs., Inc., 62 F. Supp. 2d 544, 551 (D. Conn. 1998)). Recognizing that our Court has never directly held that the members of a RICO association-in-fact enterprise must share a common *fraudulent* purpose, the District Court was nevertheless persuaded by other courts that have so held.  See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 174 (2d Cir. 2004) (noting that an association-in-fact enterprise "must share a common purpose to engage in a particular fraudulent course of conduct" (citation to quoted case omitted)), cf. United States v. Cianci, 378 F.3d 71, 83, 88 n.9 (1st Cir. 2004 (reasoning that the common purpose among members of an association-in-fact enterprise under RICO need not be fraudulent).  We need not decide whether the common purpose under RICO must be fraudulent to affirm the District Court's dismissal of Plaintiffs' RICO claims against Viacom, however, because we conclude that Plaintiffs have failed to establish that the alleged association-in-fact enterprises shared a common purpose of any kind—fraudulent or otherwise.

We review a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party.  Larson v. Kempker, 414 F.3d 936, 939 (8th Cir. 2005).  Summary judgment is appropriate only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Id.

We may affirm on any ground supported by the record. <u>Hatchett v. Philander Smith Coll.</u>, 251 F.3d 670, 674 (8th Cir. 2001).

RICO makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO allows a private party who has been injured in his property to sue for damages, <u>id.</u> § 1964(c), recovering only if he can show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 496 (1985) (footnote omitted). An "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

"The existence of an enterprise at all times remains a separate element which must be proved by the" plaintiff in order to establish a RICO violation. <u>United States v. Turkette</u>, 452 U.S. 576, 583 (1981). Proving the existence of an enterprise requires "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." <u>Id.</u> "[A]lthough much about the RICO statute is not clear, it is very clear that those who are 'associate[s],' 18 U.S.C. § 1962(e), of a criminal enterprise must share a 'common purpose.'" <u>Ryan v. Clemente</u>, 901 F.2d 177, 180 (1st Cir. 1990); <u>see, e.g.</u>, <u>Atlas Pile Driving Co. v. DiCon Fin. Co.</u>, 886 F.2d 986, 995 (8th Cir. 1989).

Plaintiffs argue that the common purpose shared by Viacom and each of the railroads was "leasing property owned by the railroad to outdoor billboard businesses." Second Amended Complaint at 34. We disagree with this characterization. Viacom's purposes and the railroads' purposes were not sufficiently aligned under the facts of this case to prove the existence of a RICO enterprise. By Plaintiffs' own account, Viacom was operating strictly in its own best interests,

appropriating billboard sites and delaying site applications when circumstances dictated that such action would benefit Viacom. Plaintiffs described several instances in which Viacom's conduct resulted in sites being "spaced out" by billboards erected on neighboring property, thus preventing the affected railroad from ever benefitting from a billboard located on its property. It is unlikely that the railroads would cooperate with Viacom to achieve this goal. Plaintiffs also described how Viacom hoped to discourage site applicants who intended to resell their billboards or licenses for what Viacom believed were undeserved profits. We cannot conceive how this goal was shared by any of the railroads, which presumably did not care who held the license for a particular billboard site as long as fees were paid. Plaintiffs also alleged that Viacom operated these RICO enterprises with a goal of eliminating competition in its billboard markets. Again, this goal would appear to be Viacom's alone, since competition for billboard sites on railroad property would presumably be in the railroads' best interests. In short, the Plaintiffs failed to allege sufficient facts to demonstrate Viacom and each of the three railroads had a "common purpose of engaging in a course of conduct." Turkette, 452 U.S. at 583. And "divergent goals" among members of a purported association-in-fact enterprise is a "fatal problem" to a RICO claim. See Baker v. IBP, Inc., 357 F.3d 685, 691 (7th Cir.), cert. denied, 543 U.S. 956 (2004). The District Court did not err in granting Viacom's motion for summary judgment on Plaintiffs' RICO claims.

### III. KELLY AND GUSTIN

We now address arguments raised by Kelly and Gustin regarding the RICO verdicts the jury returned against them. Kelly and Gustin argue that Plaintiffs failed to prove the essential elements of the RICO claims made against them individually and that the District Court therefore should not have allowed these claims to go to the jury. Instead, they argue, given the fatal deficiencies in these RICO claims, the District Court should have granted their separate motions for judgment as a matter of law. We review a district court's denial of a motion for judgment as a matter of law de novo, applying the same standards as the district court. Nat'l Farmers Union Std.

Ins. Co. v. Souris River Tel. Mut. Aid Coop., 75 F.3d 1268, 1273 (8th Cir. 1996). Judgment as a matter of law following a jury verdict is appropriate only when "the evidence is entirely insufficient to support the verdict." Belk v. City of Eldon, 228 F.3d 872, 878 (8th Cir. 2000), cert. denied, 532 U.S. 1008 (2001). In conducting our review, we consider the evidence in the light most favorable to the nonmoving party, here the Plaintiffs, giving that party the benefit of all favorable inferences that can reasonably be drawn from the evidence. See Brown v. Fred's, Inc., 494 F.3d 736, 740 (8th Cir. 2007).

Like Plaintiffs' RICO claims against Viacom, Plaintiffs' RICO claims against Kelly and Gustin were predicated on violations of 18 U.S.C. § 1962(c), which requires proof of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, 473 U.S. at 496 (footnote omitted). The requirements of § 1962(c) must be established as to each individual defendant. See, e.g., id. at 500 (noting that plaintiffs could maintain action if "the *defendants* conducted the enterprise through a pattern of racketeering activity") (emphasis added); United States v. Persico, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise."), cert. denied, 486 U.S. 1022 (1988). Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails. Cf. Sedima, 473 U.S. at 496. We focus on whether, assuming for the sake of argument that Kelly and Gustin engaged in the predicate acts of mail and wire fraud as alleged, Plaintiffs' evidence was sufficient to establish that those predicate acts can be said to form a pattern of racketeering activity.

Even if we assume that Plaintiffs' evidence was adequate to support the jury's conclusion that Kelly and Gustin committed the necessary predicate acts of mail fraud and wire fraud, we hold that the evidence was insufficient to support the jury's conclusion that Kelly and Gustin engaged in a pattern of racketeering activity as is also necessary for RICO liability. In H.J. Inc. v. Northwestern Bell Telephone Co.,

492 U.S. 229, 239 (1989), the Supreme Court observed that "to prove a pattern of racketeering activity a plaintiff . . . must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." Continuity in this context refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241. To satisfy the RICO continuity element, therefore, a plaintiff must provide evidence of multiple predicate acts occurring over a substantial period of time (closed-end continuity) or evidence that the alleged predicate acts threaten to extend into the future (open-ended continuity). Id. at 242. A plaintiff may establish open-ended continuity by showing that the predicate acts themselves involve a distinct threat of long-term racketeering activity or that the predicate acts constitute a regular way of conducting an ongoing legitimate business or a RICO enterprise. Id. at 242–43.

Here, the only theory advanced by Plaintiffs with respect to the continuity element was a theory of open-ended continuity. The jury was instructed, "Plaintiffs must prove that the acts of racketeering are related to each other and that they pose a threat of continued criminal activity." Instr. No. 21. Accordingly, Plaintiffs were required to show that the predicate acts of mail fraud and wire fraud committed by Kelly and Gustin "project[ed] into the future with a threat of repetition." H.J. Inc. 492 U.S. at 241. Plaintiffs' RICO theory is that Kelly and Gustin, individually, through the use of the mails and wires, devised and perpetrated a scheme by which Viacom would profess to follow a first-come, first-served procedure—thereby fraudulently inducing Plaintiffs to submit applications—but would secretly review railroad billboard site applications with the goal of appropriating desired sites for its own use. In other words, the culpable act was using the mails and wires to conceal or misrepresent the review process; it was not the review process itself. In January 2003, however, Viacom began routinely transmitting a standard form letter to all site applicants notifying them that their applications were subject to review by Viacom. At that time, Viacom effectively terminated any allegedly fraudulent scheme Kelly and Gustin conducted by expressly notifying site applicants that Viacom would

-37-

review all applications for billboard licenses and rule on each application in its discretion. Because there was no evidence that the review process would continue to be concealed or misrepresented by Kelly, Gustin, or any other Viacom employee in the future, Plaintiffs' theory of RICO continuity, and thus their RICO claims against Kelly and Gustin, must fail.

We have in the past rejected attempts to convert ordinary civil disputes into RICO cases. See, e.g., Terry A. Lambert Plumbing, Inc. v. W. Sec. Bank, 934 F.2d 976, 981 (8th Cir. 1991) (noting that RICO was not intended to apply to "ordinary commercial fraud" (citation to quoted case omitted)). Although Plaintiffs have presented evidence sufficient to establish violations of state law, they have not presented sufficient evidence to satisfy the more onerous requirements of RICO. Having carefully reviewed the record, we hold that Plaintiffs failed to produce sufficient evidence of RICO violations by Kelly and Gustin. The jury verdict on Plaintiffs' RICO claims against Kelly and Gustin therefore cannot stand, and Kelly and Gustin are each entitled to judgment as a matter of law.

Our reversal of the jury's verdict awarding damages to Plaintiffs on their RICO claims against Kelly and Gustin requires that we now address the District Court's order awarding Plaintiffs attorney fees under RICO's fee-shifting provision. 18 U.S.C. § 1964(c). In its attorney-fees order, the District Court found that because Plaintiffs' "state theories [were] so closely intertwined with the RICO claims," attorney fees "on the entire matter [were] compensable under the federal statute." Order of July 18, 2006, at 2 (citing Wal-Mart Stores, Inc. v. Barton, 223 F.3d 770, 773–74 (8th Cir. 2000). Because Plaintiffs are no longer prevailing parties for purposes of RICO's fee-shifting provision, they are no longer entitled to recover the attorney fees related to their RICO claims, and we therefore reverse the District Court's order awarding attorney fees on Plaintiffs' RICO claims against Kelly and Gustin.

As for Plaintiffs' state-law claims, Missouri and Connecticut both follow the "American" rule for determining whether an award of attorney fees is appropriate. See Randolph v. Mo. Hwys & Transp. Comm'n, 224 S.W.3d 615, 619 (Mo. Ct. App. 2007); Ames v. Comm'r of Motor Vehicles, 839 A.2d 1250, 1255 (Conn. 2004). Under the American rule, each party is generally required to bear the expense of his own attorney fees. Attorney fees may be awarded if they are "provided for by statute, contract or 'when needed to balance benefits in a court of equity.'" Randolph, 224 S.W.3d at 619 (citations to quoted case omitted); see Ames, 839 A.2d at 1250. Because the District Court's award of attorney fees was based not only on Plaintiffs' RICO claims but also on their "closely intertwined" state-law claims, we are unable to determine in the first instance what amount of that award, if any, Plaintiffs are entitled to with respect to their state-law claims. Accordingly, we remand the attorney-fee issue to the District Court for reconsideration in light of this opinion.

In addition, Plaintiffs argue that the District Court abused its discretion by neglecting to rule on their request for attorney fees for work performed by the Wyrsch Hobbs law firm. We agree with Plaintiffs that the court's inadvertent failure to rule on this request was an abuse of discretion, and we direct the District Court on remand to give initial consideration to attorney fees for the Wyrsch Hobbs firm.

## IV.  CONCLUSION

In conclusion, we affirm the District Court's judgment on the jury's verdict in favor of Plaintiffs on their state-law claims against Viacom; affirm the District Court's judgment dismissing all of Massood's claims against Viacom; affirm the District Court's summary judgment for Viacom on Plaintiffs' RICO claims; and reverse the District Court's judgment on the jury's verdict in favor of Plaintiffs on their RICO claims against Kelly and Gustin. In addition, we reverse the District Court's judgment awarding punitive damages in the amount of $50,000 to Patriot and attorney fees and expenses in the amount of $1,863,840 to Plaintiffs on their RICO claims against Kelly and Gustin. We remand the case to the District Court for reconsideration of the

punitive-damages and attorney-fees issues in light of this opinion.  This case is also remanded for initial consideration of the request for attorney fees for the Wyrsch Hobbs law firm.

_____